# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6756 | **DATE** | 11/12/2002 |
| **CASE TITLE** | Carlton Lyman vs. Massanari | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Parties cross motions for summary judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due ___ ___.
(3) ☐ Answer brief to motion due ___. Reply to answer brief due ___.
(4) ☐ Ruling/Hearing on ___ ___ set for ___ ___ at ___.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ___ ___ set for ___ ___ at ___.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ___ ___ set for ___ ___ at ___.
(7) ☐ Trial[set for/re-set for] on ___ ___ at ___.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ___ ___ at ___.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Commissioner's motion for summary judgment is granted and Lyman's motion for summary judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | NOV 15 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 11/12/2002 | |
| mm | courtroom deputy's initials | 02 NOV 12 PM 9:48 | date mailed notice | |
| | | | mm | |
| | | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARLTON LYMAN, )
)
         Plaintiff, )
)
vs. ) Case No. 00 C 6756
)
LARRY G. MASSANARI[1] )
Acting Commissioner of Social Security )
Administration, )
)
         Defendant. )

DOCKETED
NOV 15 2002

## MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, Magistrate Judge:

Plaintiff Carlton Lyman seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §1382. This matter is before the Court on the parties' cross-motions for summary judgment (Docket Entry #18-1). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). For the reasons set forth below, Lyman's motion is denied and the Commissioner's motion is granted.

### PROCEDURAL HISTORY

Lyman claims that he became disabled on August 1, 1996 due to an eye condition called blepharospasm. (R. 135-37; Pl. Mem., p. 1). On July 20, 1998, he applied for SSI, but his

---

[1] Larry G. Massanari is substituted for his predecessor pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

application was denied initially and again on reconsideration. (R. 81-84, 93-95). The Commissioner found that Lyman was not disabled because his eye condition was not sufficiently severe. (R. 81, 93). Lyman appealed the Commissioner's decision and requested an administrative hearing, which was held on April 24, 2000.[2] (R. 30-32, 99). On May 26, 2000, the Administrative Law Judge ("ALJ") denied Lyman's claim for SSI. The ALJ found that Lyman suffered from blepharoptosis, a severe impairment under the Social Security regulations, 20 C.F.R. §416.921, but that he retained the functional capacity to perform a significant range of medium work that would not require fine visual acuity. (R. 11-15). On September 22, 2000, the Appeals Council denied Lyman's request for review (R. 5-6), and the ALJ's decision therefore became the final decision of the Commissioner. *See* 20 C.F.R. §§416.1481.

## FACTUAL BACKGROUND

Lyman, born on August 2, 1943, was 56 years old at the time of the hearing before the ALJ. (R. 135). He has a college education but has not held significant employment for more than 15 years. (R. 38, 70).

### A. Medical Evidence

On June 27, 1997, Lyman had an operation to correct bilateral lower eyelid ectropion (a rolling outward of the eyelid). Stedman's Illustrated Medical Dictionary, 1169 (5th Lawyers' ed.) (hereinafter Stedman's). (R. 188-89). According to Lyman, he was hit in the face approximately two years before the surgery, which caused his eyelids to "bubble." (R. 37, 188). At the time of the operation, Lyman's best corrected vision was 20/25, and with the exception of the ectropion,

---

[2] The hearing was initially scheduled for November 17, 1999. On that date, Lyman appeared without counsel and the Administrative Law Judge granted him a 30 day extension to obtain representation. (R. 18-29). Lyman ultimately waived his right to counsel. (R. 134).

2

his examination was normal. Surgery was indicated because Lyman "wanted a better appearance." (R. 188).

On January 16, 1998, Dr. William O. P. Dorsey, III performed an ophthalmological examination on Lyman at the request of the Illinois Disability Determination Service ("DDS"). (R. 198). Lyman complained of constant burning and aching in both eyes and reported that he frequently used artificial tears for the symptoms. Dr. Dorsey determined that Lyman's uncorrected vision was 20/30 in the right eye and 20/20 in the left eye. In addition, "[t]he pupils were equally round and reactive to light"; "[c]onfrontation visual fields were full in each eye"; "the cornea, anterior chamber, iris and lens [were] within normal limits"; and the lower lids showed "good, tight apposition." (*Id.*) Dr. Dorsey noted that Lyman had surgery to repair bilateral ectropion and indicated that he was presbyopic (farsighted), but offered no recommendations for him. THE MERCK MANUAL OF MEDICAL INFORMATION – 17th Edition, 704 (Mark Beers, M.D. and Robert Berkow, M.D. et al. eds., 1999).

On September 17, 1999, Dr. Mark Duffy completed a consultative ophthalmological examination on Lyman, again at the request of DDS. (R. 204-05). Lyman complained of blurred vision and "jumpy black spots" in both eyes and reported that he had surgery in the past to burn off moles or warts and to tighten the eyelids. At the time of the examination, Lyman did not wear corrective lenses and was not taking any ocular medications, but he reported that he did not drive because he had been denied a license. Dr. Duffy determined that Lyman's uncorrected vision was 20/50 in his left eye and 20/40 in his right eye, which was corrected to 20/30 bilaterally. Lyman showed bilateral upper lid ptosis (drooping) and both eyelids bisected the pupillary axis. Stedman's, at 1169. Dr. Duffy diagnosed minimal myopia, minimal cataracts

which were not visually significant, blepharitis (inflammation of the eyelids) from which Lyman was relatively asymptomatic, and blepharoptosis (drooping of the upper eyelids) which was visually significant. Stedman's, at 177-78. Dr. Duffy indicated that Lyman "may benefit" from having the ptosis corrected. (R. 204-05).

Also on September 22, 1999, Dr. Duffy completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) for Lyman. Dr. Duffy stated, without explanation, that Lyman's ability to lift and carry was affected by his impairment. He also stated that Lyman's ability to see was partially affected by the impairment but that he showed "only a mild decrease [in] vision" based on Lyman's visual acuity tests. (R. 206-07).

### B.    Medical Expert Testimony

At the hearing before the ALJ, Dr. William E. Deutsch, an ophthalmologist, testified as a medical expert ("ME"). Dr. Deutsch did not personally examine Lyman, but he reviewed his medical history, listened to Lyman's testimony and had the opportunity to question him directly. (R. 58-67). Dr. Deutsch stated that Lyman's impairment was "more an impairment of the lids, than they are of the eyes themsel[ves]." (R. 63). In other words, Lyman's vision was limited because "his upper lids fall over the pupil area space, so that limits what he sees when his lids are closed." Dr. Deutsch also indicated that Lyman showed spasms of the eyelids, called blepharospasms (spasmodic winking, or contraction of the eye muscle). Stedman's, at 178. The ME stated that this condition was mentioned in the consultative examination; however, the only conditions actually identified in that examination were blepharitis and blepharoptosis. (R. 204-05). The ME indicated that Lyman's blepharospasms, together with his inability to keep his eyes open and his double vision, would constitute a severe impairment. (R. 64).

4

Dr. Deutsch noted that Lyman's surgery had corrected his lower lid problems and indicated that his upper lid problems could be "functional in nature," that is, he closed his eyes out of habit "because he doesn't want to see what's out there." (R. 64-65, 69). The doctor also stated that the only ascertainable cause of Lyman's blurry vision was his drooping eyelids. (R. 66). The ME questioned Lyman as to whether he experienced fatigue in connection with the double vision, but Lyman said that he did not. This response apparently suggested to the ME that the eyelid spasms were not caused by a neurological problem such as myasthenia gravis. (R. 59-61, 63-64). Dr. Deutsch stated that Lyman's condition prevented him from working around moving machinery and at heights because his inability to keep his eyes open for long periods of time presented a safety concern. However, the ME agreed that Lyman could perform "[g]ross activity on a frequent basis, but not on a repetitive basis." (R. 66-67).

## C. Vocational Expert Testimony

Thomas Grzesik testified at the hearing as a vocational expert ("VE") and stated that there were approximately 31,000 jobs in the Chicago metropolitan area which Lyman could perform. In reaching this conclusion, Mr. Grzesik considered the following factors, presented by the ALJ in a hypothetical question: Lyman's age, education (ability to read, write and use numbers), and general physical capacity to perform a broad range of medium work. The medium work included standing, walking or sitting for a total of six hours in an eight-hour workday; lifting up to 35 pounds occasionally and 20 pounds frequently; setting his own work pace and not engaging in fine manipulation or coordination tasks for prolonged periods of time; and avoiding safety hazards, temperature extremes, fumes, smoke and dust. (R. 70-71). Mr. Grzesik stated

that there were approximately 20,000 material handling positions, 8,000 stock clerk positions and 3,000 commercial office cleaning positions meeting these requirements. (R. 72).

D.     **Plaintiff's Testimony**

Lyman testified that he had an operation in the summer of 1997 to remove loose tissue hanging off his lower eyelids. Since that time, Lyman said, he has experienced excessive blinking and "jumping" vision, as well as "double players" or double vision. (R. 37-38, 54). Lyman stated that if he wants to see something he needs to hold his eyelids open with his fingers; after awhile, however, his vision becomes blurry. (R. 66). Lyman testified that he obtained a valid driver's license in April 1998 but does not attempt to drive more than a block or two. (R. 37, 42, 49, 181). He also stated that he could lift and carry 10 pounds but was not sure about 20 pounds because of a back problem. (R. 44-45). Lyman reported that he performs odd jobs for subsistence, including cutting grass, shoveling snow and changing tires. (R. 39-40, 45-46). He also stated that he rarely watches television – "I might watch it five minutes and my eyes – I don't see" – and he does not read because it causes his eyes to ache, burn and "jump." (R. 48, 53-54). Lyman said that in order to get to the hearing, he took public transportation and walked several blocks by himself. (R. 50-53). In addition, he reported no problem seeing the ALJ or reading his nameplate from seven or eight feet away. (R. 37, 50).

E.     **The ALJ's Findings**

The ALJ found that "the medical evidence indicates that the claimant has blepharoptosis," a severe physical impairment. However, he also found that the impairment was "not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 13). The ALJ

6

concluded that Lyman had no past relevant work, but found that Lyman "has the residual functional capacity to perform the exertional demands of medium work, with the possible restriction that he may not be able to perform work requiring fine visual acuity due to his blepharoptosis." (R. 12-13).

In determining Lyman's functional capacity, the ALJ considered the objective medical evidence reported both by doctors from Cook County Hospital where Lyman had his eye surgery, and by Dr. Dorsey. He also considered Lyman's 1997 medical records from Oak Forest Hospital which indicated that Lyman was noncompliant and had a history of alcoholism. The ALJ determined that only one other visit to Oak Forest Hospital possibly implicated Lyman's eye impairment, but the progress notes for that visit indicated that Lyman "needs paper work filed [sic] out." (R. 13). The ALJ did not specifically mention the September 22, 1999 report from Dr. Duffy but did conclude that Lyman suffers from blepharoptosis, a condition mentioned only in that report. (R. 205). In addition to the medical records, the ALJ considered the testimony of Dr. Deutsch who stated that Lyman's eye surgery successfully repaired his bilateral ectropion and that the drooping of Lyman's upper eyelids "was possible somatization, as reported by the claimant, to avoid 'what the world offers.'" (R. 14). The ALJ also noted Lyman's own testimony that his only medication is Tylenol; that he performs "seasonal lawn and labor chores" in the neighborhood; that he is able to go out and socialize; that he arises at 7:00 a.m.; that he has a 1998 driver's license without any restrictions and is able to drive a car for one or two blocks; that he "used a power lawnmower and once or twice used a snow blower, this past winter"; and that he does what work he has to do "to get by" and had received no recent medical treatment. (*Id.*)

Based on Lyman's age, education, work experience and residual functional capacity, the ALJ concluded that Lyman is "capable of making a successful adjustment to work that exists in significant numbers in the national economy." (R. 14). The ALJ adopted the opinion of the VE who found that a hypothetical individual of Lyman's age, education, work experience and functional limitations as established by the record could perform some 20,000 material handling jobs, 8,000 labor jobs, and 3,000 commercial cleaning jobs at the medium exertional level. In addition, such an individual could perform some 4,000 material handling jobs, 3,000 office cleaning jobs, and 4,000 sales clerk jobs (clothing, linens and dry goods) at the light exertional level. (*Id.*) As a result, the ALJ concluded that Lyman was "not under a disability" at any time through the date of the decision and, therefore, was not eligible for Social Security benefits. (R. 15-16).

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is governed by §205(g) of the Social Security Act. *See* 42 U.S.C. §405(g). The ALJ's findings are generally entitled to great deference because the ALJ, not the court, is responsible for weighing conflicting evidence and for making a final determination of whether the claimant is disabled. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (court may not "reweigh the evidence, or substitute [its] own judgment for that of the Commissioner"). The Court may reverse the ALJ's decision "only if the evidence 'compels' reversal, not merely because the evidence supports a contrary decision." *Betancourt v. Apfel*, 23 F. Supp. 2d 875, 880 (N.D. Ill. 1998) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

At the same time, the court cannot act as an uncritical "rubber stamp" for the Commissioner's decision and should only affirm findings of fact when they are supported by substantial evidence. *Howell v. Sullivan*, 950 F.2d 343, 347 (7th Cir. 1991); *Hereford v. Shalala*, 48 F.3d 1221 (7th Cir. 1995). Substantial evidence includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In social security disability hearings, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)). Failure to fulfill this duty constitutes good cause to remand for gathering of additional evidence. *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir. 1981).

## B. Five-Step Inquiry

A person is disabled within the meaning of the Social Security Act if he has is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. §416.905. In determining whether Lyman suffered from a disability, the ALJ conducted the standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§404.1520, 416.920; *Clifford*, 227 F.3d at 868.

A claimant will automatically be found disabled if he makes the requisite showing at steps one through three. *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 n.3 (7th Cir. 1999); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). If the claimant is unable to satisfy step three, he must then show that he is unable to perform his prior job. *Henderson*, 179 F.3d at 512 n.3. If he makes this showing, the burden then shifts to the Commissioner to show that the claimant has the ability to engage in other work existing in significant numbers in the national economy. *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

## C. Analysis

Lyman argues that the ALJ improperly concluded at step three of the analysis that his medical condition was not severe enough to meet or equal one of the impairments listed in the regulations, 20 C.F.R. §404, Sub. P, Appendix 1. Pl. Mem., p. 4. The ALJ found that Lyman suffers from blepharoptosis which, though severe, does not meet or equal one of the listed impairments. Lyman claims that he suffers from both blepharoptosis and blepharospasms, and that the ALJ should have considered both conditions in determining the severity of his impairment. According to Lyman, the blepharoptosis, the blepharospasms, the double vision and his inability to keep his eyes open without holding his eyelids with his fingers render him functionally blind. *Id.* p. 7.

In support of this position, Lyman cites *Wood v. Chater*, 952 F. Supp. 785 (M.D. Fla. 1997). In *Wood*, the court found that the plaintiff met the definition of statutory blindness due to his severe blepharospasms which rendered him unable to "even open his eyes for more than a split second to see." *Id.* at 787. The plaintiff did not benefit from Botox injections and was not a candidate for surgery, and his condition was said to be "severe, debilitating, chronic and

10

progressive." *Id.* at 789. In reaching this decision, the court noted that blepharospasm "manifests itself in varying levels of severity that may change over time for better or worse. Some victims are more amenable to treatment than others." The court also clarified that it "d[id] not hold that the condition itself, without evidence of severe and debilitating visual limitations, constitutes statutory blindness." *Id. See also Albright v. Apfel*, No. 99 C 319, 1999 WL 1129102, at *7 (N.D. Ill. Dec. 7, 1999) (noting that *Wood* involved a plaintiff with "untreated blepharospasm" and finding that case distinguishable from one where the plaintiff experienced significant relief from Botox injection).

Unlike the plaintiff in *Wood*, Lyman was never formally diagnosed with blepharospasms. The only physician who indicated that Lyman suffers from that condition was Dr. Deutsch, the ME. Dr. Deutsch never actually examined Lyman but he did report personally observing some spasms of Lyman's eyelids at the hearing. Dr. Deutsch incorrectly stated that these blepharospasms were mentioned in the consultative examination. In fact, Dr. Duffy, who unlike Dr. Deutsch performed a physical examination on Lyman, diagnosed only blepharitis and blepharoptosis. However, Dr. Deutsch specifically testified that Lyman's observed blepharospasms, together with his inability to keep his eyes open and his double vision, would constitute a severe impairment. (R. 64-65). The Commissioner points out that the ALJ conceded that Lyman's impairment was severe, just not severe enough to equal one of the impairments listed in the regulations. Def. Mem. p. 7.

The law is clear that an ALJ is not required to discuss every piece of evidence but must only minimally articulate his reasoning. *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995). Here, the ALJ did not specifically mention Lyman's symptoms of blepharospasms as observed by

11

Dr. Deutsch. However, the ALJ did fully discuss Dr. Deutsch's opinions regarding Lyman's drooping eyelids – which the ME stated was possible somatization – and regarding the successful repair of Lyman's bilateral ectropion. (R. 13, 14). In addition, the ALJ reviewed all of Lyman's medical records dating back to 1997, including his consultative examinations, the most recent of which showed that Lyman had "only a mild decrease" in his vision from blepharoptosis. (R. 13). He also considered Lyman's own testimony regarding his ability to see and perform basic functions. (R. 14). Specifically, Lyman testified that he has an unrestricted driver's license which he obtained in April 1998, almost two years *after* his claimed condition rendered him disabled, and he can drive a block or two either forward or in reverse. In addition, Lyman was able to take public transportation and walk several blocks to the hearing by himself without any problem, and he had no trouble seeing the ALJ. *Compare Wood*, 952 F. Supp. at 787, 789 (plaintiff's blepharospasms prevented him from opening his eyes for more than a split second, and the spasms caused his eyes to close for as long as four or five minutes at a time). Lyman also testified that he had not sought any recent medical treatment for his condition. *Compare Wood*, 952 F. Supp. at 787 (plaintiff was formally diagnosed with "severe debilitating essential blepharospasm bilaterally" and underwent a series of unsuccessful treatments for the condition).

In the end, the ALJ did conclude that Lyman suffers from a severe impairment, which is wholly consistent with Dr. Deutsch's opinion that blepharospasms, together with double vision and an inability to keep one's eyes open, would be severely impairing. Thus, Lyman's challenge really goes to the ALJ's weighing of the medical evidence to find that Lyman was not functionally blind, and since the Court can "track the ALJ's reasoning and be assured that the

ALJ considered the important evidence," the ALJ has met the minimal articulation standard. *See Diaz*, 55 F.3d at 308.

Lyman next argues that the ALJ's finding that he "could find employment as a stock handler or sales clerk, is also against the manifest weight of the evidence." Pl. Mem., p. 7. Lyman claims that he cannot lift boxes because he needs to hold his eyelids open with one hand. Thus, Lyman says, the "vocational expert's hypothetical presumes an ability that Mr. Lyman's blepharospasms preclude." *Id.* pp. 7-8. However, the VE did not state that Lyman could only perform work lifting boxes. The VE identified some 31,000 medium and light level jobs available to Lyman, including 6,000 commercial cleaning jobs and 4,000 sales jobs which would not necessarily require him to lift boxes. (R. 14). This is more than sufficient. *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (1,400 jobs considered significant). In addition, Lyman himself testified that he performed seasonal lawn and labor chores in the neighborhood, used a power lawnmower and once or twice used a snow blower the previous winter. Lyman also testified that he does whatever work he has to do "to get by." The ALJ's conclusion is supported by substantial evidence.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for summary judgment is granted and Lyman's motion for summary judgment is denied. The Clerk is directed to enter judgment in favor of the defendant.

NAN R. NOLAN
United States Magistrate Judge

Dated: November 12, 2002

13